IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term Grand Jury
Sworn in on August 1, 2024

| | |
|---|---|
| UNITED STATES OF AMERICA | : CRIMINAL NO. |
| | : |
| v. | : VIOLATIONS: |
| | : |
| MYONG CHOL-MIN, | : 50 U.S.C. § 1705 (Conspiracy to |
| | Violate the International Emergency |
| KIM YONG-BOK, | Economic Powers Act) |
| | : |
| KIM CHOL-MIN, | : 18 U.S.C. §§ 1344, 1349 (Conspiracy |
| also known as "Jack," | : to Commit Bank Fraud) |
| | : |
| RI TONG-MIN, | : 18 U.S.C. §§ 1956(a)(2)(A) & (h) |
| also known as "Elvis," | : (Conspiracy to Launder Monetary |
| | : Instruments) |
| RI WON-HO, | : |
| | : |
| KIM SE-UN, and | : |
| | : |
| SIM HYON-SOP, | : |
| | : |
| Defendants. | : |

## INDICTMENT

The Grand Jury charges that, at times material to this Indictment:

### INTRODUCTION

1.      Since the early 2000s, the Democratic People's Republic of Korea ("North Korea" or the "DPRK") has trafficked tobacco products, including counterfeit cigarettes, in order to generate revenue for its Weapons of Mass Destruction ("WMD") and nuclear programs. Pyongyang's counterfeit cigarette production capacity in particular makes North Korea one of the largest producers of such contraband in the world. To support this illegal industry, North Korea

imports large amounts of tobacco, which it then processes and resells it as cigarettes.

2.      Since at least in or around August 2007, two state-owned North Korean tobacco companies, DPRK Tobacco Company 1 and DPRK Tobacco Company 2, have purchased tobacco products from international suppliers and paid those suppliers in U.S. dollars.

3.      Beginning in or around April 2007 until approximately September 2023, employees of DPRK Tobacco Company 1, including MYONG CHOL-MIN ("MYONG"), KIM YONG-BOK ("KIM"), KIM CHOL-MIN, also known as "Jack" ("KIM CHOL-MIN"), RI TONG-MIN, also known as "Elvis" ("RI TONG-MIN"), RI WON-HO ("RI"), KIM SE UN, SIM HYON-SOP ("SIM"), and others known and unknown to the Grand Jury, engaged in a conspiracy to import tobacco into North Korea and pay for it in U.S. dollars, in violation of U.S. sanctions against the DPRK. Using multiple front companies and falsified documents, the conspirators concealed North Korea's role in these transactions from U.S. financial institutions, causing those institutions to process them. Between August 2007 and December 2020, multiple U.S. financial institutions processed at least $295 million in financial transactions to further DPRK Tobacco Company 1's cigarette and counterfeit cigarette manufacturing.

4.      From at least approximately in or around April 2021 until in or around June 2023, DPRK Tobacco Company 2 procured tobacco materials through a company in South Africa to construct cigarettes, including counterfeit cigarettes, in order to generate income for the DPRK and its regime, and paid for these materials in U.S. dollars in violation of U.S. sanctions against the DPRK. Employees of DPRK Tobacco Company 2, including MYONG, who became an executive of DPRK Tobacco Company 2 in 2021, his facilitators, including KIM SE UN, SIM, and others known and unknown to the Grand Jury, furthered the conspiracy to import tobacco for the DPRK. Here again using multiple front companies and falsified documents, the conspirators

concealed North Korea's role in these transactions from U.S. financial institutions, which then processed them.

5.     The conspirators used false shipping records to smuggle tobacco and other goods into the DPRK, and front companies to launder related U.S. dollar payments for these shipments. In doing so, the conspirators deceived and defrauded correspondent banks in the United States, which would not have processed the transactions had the conspirators not concealed their ties to the DPRK, the Foreign Trade Bank ("FTB") and/or Korea Kwangson Bank Corporation ("KKBC"), each of which had been sanctioned by the U.S. Department of the Treasury.

## JURISDICTION AND VENUE

6.     Acts and omissions in furtherance of the offenses alleged herein occurred within the District of Columbia. Pursuant to Title 18, United States Code, Section 3237, venue is proper in the District of Columbia.

7.     Additionally, certain of the offenses alleged herein were begun and committed outside of the jurisdiction of any particular state or district of the United States, and none of the defendants resided in the United States. For those offenses, pursuant to Title 18, United States Code, Section 3238, venue is proper in the District of Columbia.

## BACKGROUND

### I.     United Nations Sanctions

8.     On October 14, 2006, the United Nations ("UN") Security Council passed Resolution 1718 condemning the DPRK's first nuclear test and imposing sanctions on the DPRK, including the supply of heavy weapons and select luxury goods. After successive nuclear tests by the DPRK, the UN Security Council strengthened existing sanctions or imposed additional sanctions in 2009, 2013, 2016, and 2017.

## II.    International Emergency Economic Powers Act

9.    The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50 U.S.C. § 1701 *et seq.*, authorized the President to impose economic sanctions in response to an unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States when the President has declared a national emergency with respect to that threat. Under IEEPA, it is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any order, license, regulation, or prohibition issued pursuant to the statute. 50 U.S.C. § 1705.

10.    Using the powers conferred by IEEPA, the President and the Executive Branch have issued orders and regulations governing and prohibiting certain transactions with countries, individuals, and entities suspected of proliferating Weapons of Mass Destruction ("WMD"). On November 14, 1994, the President issued Executive Order ("EO") 12938, finding "that the proliferation of nuclear, biological, and chemical weapons ('weapons of mass destruction') and of the means of delivering such weapons, constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and [declaring] a national emergency to deal with that threat."

11.    On June 28, 2005, the President took additional steps with respect to the national emergency declared in EO 12938 and issued EO 13382 ("Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters") to target proliferators of WMD and their support networks and to deny designated proliferators access to the U.S. financial and commercial systems. EO 13382 authorized the U.S. Secretary of the Treasury, in consultation with the U.S. Secretary of State, "to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes" of the EO.

12.     On June 26, 2008, the President issued EO 13466, finding that "the existence and risk of the proliferation of weapons-usable fissile material on the Korean Peninsula constituted an unusual and extraordinary threat to the national security and foreign policy of the United States" and declaring a "national emergency to deal with that threat."

13.     Pursuant to authority under EOs 12938 and 13382, on April 13, 2009, the Secretary of the Treasury promulgated the "Weapons of Mass Destruction Proliferators Sanctions Regulations." *See* 31 C.F.R. Part 544. EO 13382 and the WMD Proliferators Sanctions Regulations prohibit transactions or dealings by any U.S. person or within the United States with individuals and entities whose property and interests in property are blocked pursuant to those authorities, unless exempt or authorized by the Department of the Treasury's Office of Foreign Assets Control ("OFAC"), which is located in Washington, D.C. The names of such individuals and entities are published in OFAC's Specially Designated Nationals and Blocked Persons ("SDN") List. U.S. persons, including U.S. financial institutions, are generally prohibited from dealing with SDNs and their property and interests in property.

14.     On August 11, 2009, OFAC designated the DPRK bank KKBC under EO 13382 and added it to the SDN List for providing financial services in support of both Tanchon Commercial Bank and Korea Hyoksin Trading Corporation, both of which were previously identified by the President as WMD proliferators. All three entities had been designated by the UN in 2006 pursuant to UN Security Council Resolution 1718 for their roles in DPRK's WMD and missile programs. At the time of the OFAC designation, the Department of the Treasury Under Secretary for Terrorism and Financial Intelligence stated, "North Korea's use of a little-known bank, KKBC, to mask the international financial business of sanctioned proliferators demonstrates

the lengths to which the regime will go to continue its proliferation activities and the high risk that any business with North Korea may well be illicit."

15.    On March 11, 2013, OFAC designated FTB, DPRK's primary foreign exchange bank, pursuant to EO 13382, for providing financial services that assisted in the proliferating of WMD. In the designation, the Department of the Treasury stated, "North Korea uses Foreign Trade Bank to facilitate transactions on behalf of actors linked to its proliferation network, which is under increasing pressure from recent international sanctions. . . . By designating Foreign Trade Bank, the Treasury Department is targeting a key financial node in North Korea's WMD apparatus and cutting it off from the U.S. financial system. Foreign Trade Bank is a state-owned bank established in 1959. Foreign Trade Bank acts as North Korea's primary foreign exchange bank and has provided key financial support to [KKBC]."

16.    On March 15, 2016, the President, in order to take additional steps with respect to the national emergency described in EO 13466, issued EO 13722 to address the DPRK's continuing pursuit of its nuclear and missile programs. Among other things, EO 13722 imposed a comprehensive blocking of the property and interests in property of the DPRK and the Workers' Party of Korea. As a result, U.S. persons, including U.S. financial institutions and companies, are generally prohibited from transacting with the DPRK.

17.    On March 5, 2018, OFAC amended and reissued the North Korea Sanctions Regulations ("NKSR") in their entirety to implement EO 13722, among others. 83 Fed. Reg. 9182 (Mar. 5, 2018). Absent permission from OFAC in the form of a license, the NKSR prohibits, among other things, the exportation or re-exportation, directly or indirectly, from the United States, or by a U.S. person, wherever located, of any goods, services, or technology to North Korea. 31 C.F.R. § 510.206(a); *see also* EO 13722 § 3. This prohibition applies to services, including

financial services, performed on behalf of a person in the DPRK or where the benefit of such services is otherwise received in North Korea. 31 C.F.R. § 510.405. The NKSR also prohibit any transactions that evade or avoid, or have the purpose of evading or avoiding, any prohibition set forth in the NKSR. 31 C.F.R. § 510.212.

### III.    Bank Secrecy Act

18.    Foreign financial institutions maintain U.S. dollar bank accounts ("correspondent accounts") at banks in the United States ("correspondent banks"). Correspondent accounts are broadly defined to include any account established for a foreign financial institution to receive deposits from, or to make payments or disbursements on behalf of, the foreign financial institution, or to handle other financial transactions, such as currency conversions, related to such foreign financial institution. *See* 31 C.F.R. § 1010.605. Correspondent banks support international wire transfers for foreign customers in a currency that the foreign customer's overseas financial institution normally does not hold on reserve, such as U.S. dollars, and conduct currency conversions to/from U.S. dollars. It is through these correspondent accounts that the funds used in U.S. dollar transactions clear and/or are converted into other currencies.

19.    The global financial system relies on correspondent banking relationships. Nearly all U.S. dollar wire transactions conducted by foreign financial institutions are processed through correspondent bank accounts held in the United States. Foreign financial institutions include not only banks, but also dealers of foreign exchange and money transmitters. *See* 31 C.F.R. § 1010.605(f).

20.    The Bank Secrecy Act ("BSA") requires U.S. financial institutions to take anti-money laundering measures reasonably designed to ensure that correspondent bank accounts established by foreign financial institutions are not used to finance terrorism or to violate U.S.

sanctions. The Treasury Department's Financial Crimes Enforcement Network ("FinCEN") is responsible for administering the Bank Secrecy Act in furtherance of its mission to safeguard the U.S. financial system. In addition, under the Bank Secrecy Act, U.S. financial institutions are required to report to FinCEN all suspicious transactions that may violate U.S. laws or which are indicative of money laundering, financing of terrorism or other crimes.

21. Under the BSA, FinCEN may impose "special measures" to target specific areas of concern for money laundering or terrorist financing. *See* USA PATRIOT Act § 311, codified at 31 U.S.C. § 5318A. Section 311 prohibits U.S. financial institutions from engaging in any type of financial transaction with any entity within a jurisdiction determined to be an area of concern.

22. In June 2016, FinCEN determined that the entire DPRK financial sector was a primary money laundering concern. 81 Fed. Reg. at 35665 (June 3, 2016). On November 9, 2016, FinCEN implemented a special measure, barring all U.S. financial institutions from maintaining a correspondent bank account for any DPRK financial institution or any party acting on its behalf. A second special measure required U.S. financial institutions to exercise "enhanced due diligence" and take reasonable steps to not process transactions for correspondent accounts of foreign financial institutions in the United States if such transaction involved a DPRK financial institution. In effect, this barred all DPRK financial institutions and entities acting on their behalf from engaging in U.S. dollar transactions through correspondent banking transfers in the United States. Failure to comply with the special measures implemented by FinCEN, or to report suspicious transactions to FinCEN as required by the BSA results in potential civil and criminal liability for U.S. financial institutions.

23.    As a result of the BSA, the North Korea Sanctions Regulations, the FinCEN 311 action, and overall risk management, U.S. correspondent banks have refused to knowingly process any U.S. dollar wire transactions involving entities in the DPRK since at least March 2016.

## IV.    DPRK Banking and Use of Front Companies

24.    The DPRK financial sector is comprised of state-controlled financial institutions that use "front companies to conduct international financial transactions that support the proliferation of WMD and the development of ballistic missiles in violation of international and U.S. sanctions," and are subject to "little or no bank supervision or anti-money laundering or combating the financing of terrorism controls." 81 Fed. Reg. at 78715 (Dec. 9, 2016)

25.    The UN Panel of Experts found that once the DPRK could register a front company without overt links to the country through the assistance of foreign nationals, it became significantly easier for its firms to pass rudimentary due diligence checks by financial institutions and open and maintain bank accounts.

26.    DPRK entities have used front companies to pay their counterparties in U.S. dollars. The use of front companies and stripping material information, such as the true counterparties to the transaction, from wire transfer instructions influence the decision making of the correspondent banks into processing transactions that they otherwise normally would not, and thus constitutes bank fraud.

### Relevant Individuals and Entities

#### *North Korean Conspirators*

27.    DPRK Tobacco Company 1 was a tobacco and cigarette company located in the DPRK. DPRK Tobacco Company 1 was an arm of the central government of the DPRK, subordinate to the Korea Worker's Party Finance and Accounting Department, Bureau 125, which

handles budget and accounting maters for the DPRK. DPRK Tobacco Company 1 was located in Pyongyang, DPRK. The following employees and affiliates were involved in the conspiracy related to DPRK Tobacco Company 1:

a. MYONG Chol-Min ("MYONG") was a DPRK national born in Pyongyang. MYONG was an employee of DPRK Tobacco Company 1 from at least 2008 though approximately in or around December 2019. MYONG was formerly the chairman of a joint venture established by DPRK Tobacco Company 1. MYONG served in a senior-level position at DPRK Tobacco Company 1 and, from at least in or around 2016 to in or around 2017, operated the Thailand branch of DPRK Tobacco Company 1 to procure tobacco materials.

b. Kim Yong-Bok ("KIM YONG-BOK") was a DPRK national born in North Phyongan, DPRK. KIM YONG-BOK was the CEO of DPRK Tobacco Company 1 and from at least in or around 2004 to in or around 2019, worked at DPRK Tobacco Company 1 headquarters in the DPRK.

c. Kim Chol-Min, also known as "Jack" ("KIM CHOL-MIN"), was a DPRK national born in Pyongyang. From at least in or around 2016 to in or around 2019, KIM CHOL-MIN was MYONG's assistant at DPRK Tobacco Company 1.

d. Ri Won-Ho ("RI WON-HO") was a DPRK national born in South Phyongan, DPRK. RI WON-HO was the Supply Director of DPRK Tobacco Company 1 and, from at least in or around 2016 to in or around 2019, worked at the DPRK Tobacco Company 1 headquarters in the DPRK.

e. Ri Tong-Min, also known as "Elvis" ("RI TONG-MIN"), was a DPRK national born in Pyongyang. RI TONG-MIN operated a company in Dalian, China, independent

from DPRK Tobacco Company 1, and worked to help receive and transship goods to the DPRK for DPRK Tobacco Company 1.

28.     DPRK Tobacco Company 2 was a DPRK tobacco and cigarette company. DPRK Tobacco Company 2 was a state-owned entity that was operated by the DPRK's Ministry of People's Armed Forces and tasked with producing DPRK cigarettes. On June 1, 2017, OFAC designated the Ministry of People's Armed Forces ("MPAF") pursuant to EO 13722 as an agency, instrumentality, or controlled entity of the Government of North Korea, due to its assistance in helping the DPRK develop a WMD program. The following employees and affiliates were involved in the conspiracy related to DPRK Tobacco Company 2:

a. MYONG was an employee of DPRK Tobacco Company 2 from approximately December 2019 until September 2023. MYONG moved to DPRK Tobacco Company 2 in or around 2019, and, from that time to September 2023, held a high-level position at DPRK Tobacco Company 2.

b. Kim Se Un ("KIM SE UN") was a DPRK national born in Nampho, DPRK, who throughout 2021 resided outside of the DPRK, operating as the General Director for a venture trading company in Southeast Asia, which was affiliated with a North Korean state-owned entity. KIM SE UN assisted MYONG with respect to transactions on behalf of DPRK Tobacco Company 2.

c. SIM HYON-SOP ("SIM") was a DPRK national who, from at least in or around 2016 to in or around 2023, was a North Korean FTB employee based in Dubai, United Arab Emirates ("UAE"). In furtherance of the scheme, SIM effected transfers of funds from North Korea to a company doing business with DPRK Tobacco

Companies 1 and 2. SIM funded certain of these transactions through transfers from various financial accounts and associates.

29.     The conspirators used multiple front companies during the conspiracy to process banking transactions and on their paperwork, including:

a.   Dandong Hongxiang Industrial Development ("DHID") was a Chinese conglomerate consisting of approximately 30 front companies that were used to trade with the DPRK and make payments to companies outside of the DPRK. DHID processed payments for the clientele of both KKBC and FTB. Between approximately August 2009 and August 2016, DHID laundered hundreds of millions of dollars for KKBC. DHID and its related entities received goods, such as coal, from the DPRK. In lieu of paying the DPRK for these goods, KKBC directed DHID to pay third parties in U.S. dollars for commodities that the DPRK wanted to obtain. On September 26, 2016, OFAC sanctioned DHID and also noted that DHID acted on behalf of KKBC.

b.   Dalian Sun Moon Star International Logistics Co Ltd. ("Dalian Sun Moon") a freight forwarder for DPRK tobacco, which was sanctioned by OFAC on August 15, 2018; and

c.   SINSMS PTE LTD, a Singapore-based affiliate company of Dalian Sun Moon, that employed an Indonesian agent freight forwarder, and which was sanctioned by OFAC on August 15, 2018.

### International Tobacco Suppliers

30.     British American Tobacco ("BAT") was a large international tobacco conglomerate that sells tobacco products worldwide. Its subsidiary in Asia, British American Tobacco MS ("BATMS"), established a joint venture tobacco factory in DPRK in partnership with DPRK

12

Tobacco Company 1 in 2001.[1] DPRK Tobacco Company 1 used this joint venture, of which MYONG was the chairman, to procure hundreds of millions of dollars of tobacco products from BATMS. BATMS utilized Company A in its scheme.

31.    Company A was a Singaporean conglomerate that supplies a variety of goods to various Asian markets. In 2005, BATMS appointed Company A as a distributor of BAT cigarette kitsets (component parts of cigarettes) in North Korea and other markets in Asia. Company A served as an intermediary for payments from DPRK Tobacco Company 1 to BATMS.

32.    Company B was an Indonesian paper supplier that sells paper used in cigarette production. Company B transacted with DPRK Tobacco Company 1 from June 2014 to May 2018 receiving approximately $375,000 in the form of 19 wire transfers processed by U.S. financial institutions paid from 11 different front companies used by DPRK Tobacco Company 1. Company B knew DPRK Tobacco Company 1 was located in the DPRK and that the goods were being shipped to the DPRK.

33.    Company C was a South African tobacco leaf distributor and cigarette producer. Company C transacted with DPRK Tobacco Company 1 between October 2019 and November 2020, receiving approximately $6,266,000 via multiple methods, including bulk cash smuggled out of the DPRK and commingling funds with other transfers. In April 2021, MYONG, now working for DPRK Tobacco Company 2, reestablished contact with Company C and Company C entered into an agreement to supply DPRK Tobacco Company 2. From April 2021 until at least

---

[1] BATMS pleaded guilty to a criminal information, and BAT entered into a deferred prosecution agreement, charging conspiracy to commit bank fraud and conspiracy to violate IEEPA based on these same allegations, in the District of Columbia. *See United States v. British American Tobacco P.L.C., et al.*, No. 23-cr-00118 (D.D.C.).

the fall of 2023, Company C transacted with DPRK Tobacco Company 2, receiving approximately $1,600,000 via multiple methods, including bulk cash smuggled out of DPRK.

34.    Company D was a Singaporean tobacco leaf distributor. Company D started working with DPRK Tobacco Company 1 around 2009. Company D was comprised of three individuals formerly employed by Company B who had historical connections with DPRK from their time with Company B. MYONG was the primary contact for DPRK Tobacco Company 1 for its trade with Company D. Company D transacted with DPRK Tobacco Company 1 between 2010 and 2018. During those years, DPRK Tobacco Company 1 paid at least $4,350,000 to Company D through at least 27 U.S. dollar wire transfers sent through at least 21 front companies and also two bulk cash payments.

35.    Company E was a tobacco business registered in Turkey that sells tobacco and other products around the world. Company E had a history of interacting with a DPRK procurement official outside of DPRK Tobacco Company 1's network before it started selling directly to DPRK Tobacco Company 1, with the involvement of MYONG and KIM CHOL-MIN. Company E transacted with DPRK Tobacco Company 1 between July 2018 and June 2019. During that time, DPRK Tobacco Company 1 paid at least $350,000 to Company E through at least five U.S. dollar wire transfers using at least three different front companies.

## COUNT ONE
(Conspiracy to Violate IEEPA)

### THE CONSPIRACY

28.    At all times relevant to this indictment, MYONG CHOL-MIN, KIM YONG-BOK, KIM CHOL-MIN, RI TONG-MIN, RI WON-HO, KIM SE UN, and SIM HYON-SOP, knew that the United States had imposed sanctions on North Korea and North Korean entities, and as a result, that transactions by U.S. persons, including U.S. financial institutions, or in the United States for

the benefit of North Korea and North Korean entities were prohibited without prior authorization from the United States.

29.    From on or about August 11, 2009, and continuing until in or around September 2023, MYONG CHOL-MIN, KIM YONG-BOK, KIM CHOL-MIN, RI TONG-MIN, RI WON-HO, KIM SE UN, SIM HYON-SOP, and others known and unknown to the Grand Jury, within the District of Columbia and elsewhere, did knowingly and willfully conspire to cause U.S. persons, including U.S. financial institutions, to provide funds, goods, and services, including financial services, to and for the benefit of KKBC, FTB, and other entities sanctioned by OFAC, to engage in transactions to evade and that have the purpose of evading the sanctions imposed on KKBC, FTB, North Korea, and other entities sanctioned by OFAC, and to export services, including financial services, from the United States to North Korea and the Government of North Korea, without prior authorization or a license from OFAC, which is located in Washington, D.C.

*Manner and Means*

30.     It was a part of the conspiracy that the conspirators used the following manner and means, among others, to achieve the goals of the conspiracy:

   a.  The conspirators and others caused payments to be sent to U.S. financial institutions by front companies to obfuscate North Korea's connection to the transactions.

   b.  The conspirators and others split large payments into multiple smaller payments so as to avoid bank oversight and scrutiny of the transactions.

   c.  The conspirators and others listed and caused to be listed false information on bills of lading and other transaction-related documents, including the names and locations of front companies, to hide North Korea's connection to those transactions.

   d.  The conspirators and others transmitted and caused to be transmitted to U.S. financial institutions false information, including the involvement of front companies, about U.S. dollar transactions that were, in fact, made on behalf of North Korea and DPRK Tobacco Company 1 and DPRK Tobacco Company 2.

   e.  The conspirators caused goods to be shipped to Dalian, China, a point of smuggling for goods to North Korea, and onward to North Korea.

   f.  The conspirators and others used email accounts to communicate about the payment schemes, use of front companies, and provision of false information.

*Overt Acts*

31.     In furtherance of this conspiracy and to accomplish its goals, the following overt acts, in addition to those previously alleged, among others, were committed in the District of Columbia and elsewhere.

### A. DPRK Tobacco Company 1

#### *Joint Venture Between DPRK Tobacco Company 1, BATMS and Company A*

32.    On or about April 23, 2007, BAT, which through its subsidiary BATMS had an existing joint venture with DPRK Tobacco Company 1 set to run between 2001 and 2021 ("the JV"), engaged in discussions with Company A executives about Company A inserting itself into the North Korean joint venture under an "Umbrella Agreement." In an email discussing the Umbrella Agreement, a Company A executive noted that Company A would establish a DPRK company (Company 1 DPRK) that would be "a vehicle for BAT to bring out the JV money and distribute it to BAT. [Company A] will have no beneficial interest in [Company 1 DPRK]."

33.    On or about June 8, 2007, BAT issued a press release stating that BAT "has agreed in principle to sell its share in [the JV], a joint venture cigarette business in Pyongyang with [DPRK Tobacco Company 1], a state-owned company." In reality, however, BATMS maintained significant influence over the JV and used Company A as a shell company at various points during the relevant time period, and BAT continued to benefit from BATMS's significant influence over the JV.

34.    On or about August 10, 2007, BATMS entered into the "Umbrella Agreement," which included the following relevant terms:

      a.    Per the initial 2001 JV agreement, BAT, through its subsidiary, BATMS, owned 60% of the JVTF. In January 2004, BATMS sold its 60% ownership rights to a BAT subsidiary, referred to as "BAT Holdings DPRK." At the time of the 2007 Umbrella Agreement, the outstanding balance owed on this intra-company purchase was $12,521,295.39.

b.    In the Umbrella Agreement, (i) BAT Holdings DPRK agreed to shift 10% of its ownership interest in the JV to DPRK Tobacco Company 1, resulting in a 50/50 split of the JV and (ii) BAT Holdings DPRK (including its 50% interest in the JV) was sold to Company A for the price of €1.00 (approximately $1.37 at the time), far less than the value of the business stated on BAT's internal records.

c.    The Umbrella Agreement included, among other terms, a call option that allowed a BAT subsidiary to repurchase BAT Holdings DPRK (the "Call Option Agreement"). Because BAT Holdings DPRK held a 50% ownership interest in the JV, the call option essentially gave a BAT subsidiary the right to repurchase 50% of the JV after a two-year period, if it so desired. Under the terms of the Call Option Agreement, BAT Holdings DPRK could not make any material changes to its business without the prior written approval from the BAT subsidiary that owned the call option.

d.    BATMS agreed to supply BAT Holdings DPRK with "technical and other related support services to be agreed between the relevant parties for the development of the business of [JV]."

35.    On or about August 23, 2012, a Company A employee discussed that BATMS continued to exercise significant influence over the JV. In an email from a former BATMS employee who had moved to Company A, the employee stated, "I am still working for BAT business though BAT is not directly dealing in DPRK . . . . Though the contract is under [Company A], the business is run under BAT interests. I was long requested by previous BAT senior management to help watch out the JV [sic] as it's BAT interest in the end."

36.    A later March 2015 document drafted by BATMS and BAT discussing the arrangement created by the 2007 Umbrella Agreement stated that "to ensure that BAT", through a subsidiary, held "de facto control of [Company 1 DPRK (previously known as BAT Holdings DPRK)] and through [Company 1 DPRK], significant influence over the equity accounted [JV]," various restrictions were put in place on Company 1 DPRK as described in the Call Option Agreement. The document went on to state, "The restrictions were also intended to ensure that when BAT reacquired the Holding company it would be fit for purpose. Removal of these restrictions might be perceived as a loss of control over the Holding Company." Thus, despite the apparent change in ownership of the JVTF, BATMS and BAT (by virtue of being BATMS's ultimate parent company) had significant influence over significant business decisions and the remittance process, and continued to receive profits from North Korea sales. Company A bore no financial risk from the arrangement.

### Transactions Between DPRK Tobacco Company 1, BATMS, and Company A

37.    On or about January 31, 2008, executives of DPRK Tobacco Company 1 discussed an arrangement with executives of BATMS to allow FTB, KKBC, and DHID to process payments by DPRK Tobacco Company 1. Specifically, the parties discussed that they would use a system of remitting money through FTB, DHID, and a Chinese bank, and noted that the parties were using U.S. dollars for the payments. The JV used shell companies, including DHID and its affiliated companies, to make payments on behalf of DPRK Tobacco Company 1.

38.    On or about July 3, 2014, BATMS employees received a completed questionnaire previously sent to Company 1. The responses were from Company 1 and included information that Company 1 appeared to have collected from DPRK Tobacco Company 1. They showed that DPRK

Tobacco Company 1 was using and/or had used KKBC (which was sanctioned at that time) to complete their payments. That same communication also included the following information:

    a. There are DPRK government authorities/state companies that trade with Chinese companies, mainly to export coal mining products to Chinese companies in China.

    b. Instead of the Chinese companies making payment for the coal exports to the relevant government or state companies in DPRK, they will pay the money due to DPRK to [Company A], at the request of [DPRK Tobacco Company 1], through a Chinese bank. These payments will be made in U.S. dollars.

    c. When it is confirmed that [Company A] has received the money from the Chinese company, [DPRK Tobacco Company 1] then pays the U.S. dollars to the relevant DPRK company/authority.

    d. This arrangement is possible as all companies in the DPRK are state owned.

    e. [DPRK Tobacco Company 1] uses the bank known as Korea Kwangson Bank (KKB).

39.    In or around February 2017, executives from DPRK Tobacco Company 1, including KIM YONG-BOK, then chairman of the JV, and Company A met to discuss the JV's activity. Company A emphasized to DPRK Tobacco Company 1 that all future payments must not be made via wire transfers which were being blocked by intermediary banks. This discussion occurred after more than $300 million of illicit activity to include wire transfers through U.S. correspondent banks occurred between DPRK Tobacco Company 1 and Company A.

40.    Between approximately in or around 2007 and in or around March 2017, DPRK Tobacco Company 1 sent approximately $415 million in over 300 separate transactions to pay BATMS and Company A for tobacco products. These payments included both bulk U.S. dollars

in cash smuggled out of the DPRK (and later likely processed through the U.S. financial system), and wires from a network of front companies employed by DPRK Tobacco Company 1 many of which were associated with a wire transaction through a U.S. financial institution including the following:

| Sub-¶ | Date | Originator | Amount |
|---|---|---|---|
| a. | 10/01/2007 | DHID | $996,550 |
| b. | 10/31/2007 | Bulk Cash Payment[2] | $3,000,000 |
| c. | 11/09/2007 | DHID | $2,491,061 |
| d. | 01/09/2008 | DHID | $2,408,701 |
| e. | 02/26/2008 | Bulk Cash Payment | $4,000,000 |
| f. | 04/08/2008 | Bulk Cash Payment | $4,000,000 |
| g. | 04/30/2008 | DHID | $4,068,078 |
| h. | 06/4/2008 | DHID | $3,590,242 |
| i. | 07/09/2008 | DHID | $3,898,196 |
| j. | 08/11/2008 | DHID | $4,313,435 |
| k. | 09/18/2008 | DHID | $3,983,414 |
| l. | 10/20/2008 | DHID | $2,148,987 |
| m. | 11/17/2008 | DHID | $2,532,600 |
| n. | 11/28/2008 | DHID | $2,494,946 |
| o. | 12/16/2008 | DHID | $1,550,547 |
| p. | 12/22/2008 | DHID | $2,259,569 |
| q. | 12/27/2008 | Bulk Cash Payment | $3,600,000 |
| r. | 03/06/2009 | DHID | $3,219,217 |
| s. | 03/19/2009 | DHID | $2,295,638 |
| t. | 05/12/2009 | Front Company 1 | $739,258 |
| u. | 05/26/2009 | DHID | $993,970 |
| v. | 05/27/2009 | DHID | $993,980 |
| w. | 06/03/2009 | Front Company 2 | $2,000,000 |
| x. | 06/05/2009 | DHID | $798,899 |
| y. | 06/08/2009 | DHID | $708,649 |
| z. | 07/03/2009 | DHID | $1,049,963 |
| aa. | 07/06/2009 | DHID | $1,007,315 |
| ab. | 07/13/2009 | DHID | $1,280,786 |
| ac. | 07/14/2009 | DHID | $1,319,214 |
| ad. | 08/10/2009 | DHID | $1,343,716 |

[2]     Bulk cash payments were not associated with a specific wire transaction through a U.S. financial institution.

| | | | |
|---|---|---|---|
| ae. | 08/11/2009 | DHID | $1,421,150 |
| af. | 08/14/2009 | Front Company 1 | $1,132,490 |
| ag. | 09/02/2009 | Front Company 3 | $2,747,418 |
| ah. | 10/01/2009 | Front Company 3 | $4,400,823 |
| ai. | 11/09/2009 | Front Company 3 | $3,503,927 |
| aj. | 12/09/2009 | Front Company 3 | $3,867,654 |
| ak. | 01/19/2010 | Front Company 3 | $3,841,845 |
| al. | 01/28/2010 | DHID | $390,398 |
| am. | 03/30/2010 | DHID | $1,120,840 |
| an. | 04/05/2010 | Front Company 4 | $994,001 |
| ao. | 04/08/2010 | Front Company 4 | $2,127,510 |
| ap. | 05/10/2010 | Front Company 5 | $1,100,000 |
| aq. | 05/28/2010 | DHID | $1,740,333 |
| ar. | 06/09/2010 | DHID | $1,014,778 |
| as. | 06/09/2010 | Front Company 5 | $2,005,617 |
| at. | 06/30/2010 | Front Company 2 | $3,523,782 |
| au. | 07/29/2010 | Front Company 6 | $597,992 |
| av. | 07/30/2010 | Front Company 4 | $2,290,303 |
| aw. | 08/02/2010 | Front Company 6 | $501,492 |
| ax. | 08/02/2010 | Front Company 6 | $498,492 |
| ay. | 08/19/2010 | DHID | $3,694,806 |
| az. | 09/30/2010 | DHID | $2,199,967 |
| ba. | 09/30/2010 | DHID | $612,653 |
| bb. | 10/08/2010 | DHID | $989,992 |
| bc. | 11/02/2010 | DHID | $3,916,168 |
| bd. | 11/30/2010 | DHID | $4,225,789 |
| be. | 01/12/2011 | Front Company 7 | $4,084,990 |
| bf. | 02/02/2011 | Front Company 24 | $2,131,307 |
| bg. | 03/25/2011 | Front Company 8 | $3,443,235 |
| bh. | 03/29/2011 | Front Company 2 | $3,250,657 |
| bi. | 04/27/2011 | Front Company 2 | $1,857,987 |
| bj. | 04/27/2011 | Front Company 9 | $1,450,010 |
| bk. | 06/03/2011 | DHID | $1,000,000 |
| bl. | 06/08/2011 | DHID | $1,295,436 |
| bm. | 06/10/2011 | DHID | $1,299,961 |
| bn. | 06/29/2011 | Front Company 9 | $3,726,107 |
| bo. | 08/02/2011 | DHID | $999,961 |
| bp. | 08/03/2011 | Front Company 10 | $2,225,622 |
| bq. | 08/12/2011 | DHID | $613,504 |
| br. | 08/25/2011 | Front Company 10 | $1,184,517 |
| bs. | 08/26/2011 | Front Company 10 | $873,858 |
| bt. | 08/26/2011 | DHID | $999,961 |

| | | | |
|---|---|---|---:|
| bu. | 08/30/2011 | Front Company 10 | $779,496 |
| bv. | 09/28/2011 | Front Company 10 | $4,640,412 |
| bw. | 10/28/2011 | Front Company 10 | $1,773,747 |
| bx. | 11/02/2011 | DHID | $871,197 |
| by. | 11/04/2011 | DHID | $1,350,000 |
| bz. | 11/04/2011 | DHID | $990,000 |
| ca. | 12/07/2011 | DHID | $1,800,000 |
| cb. | 12/08/2011 | DHID | $1,475,157 |
| cc. | 12/08/2011 | DHID | $870,000 |
| cd. | 12/09/2011 | Front Company 7 | $800,000 |
| ce. | 01/17/2012 | DHID | $3,045,099 |
| cf. | 02/15/2012 | DHID | $1,225,684 |
| cg. | 02/17/2012 | DHID | $3,009,563 |
| ch. | 02/28/2012 | Front Company 2 | $4,145,551 |
| ci. | 04/24/2012 | DHID | $3,929,951 |
| cj. | 05/07/2012 | Front Company 9 | $2,490,000 |
| ck. | 05/08/2012 | Front Company 9 | $1,716,414 |
| cl. | 06/13/2012 | DHID | $2,084,300 |
| cm. | 06/15/2012 | DHID | $2,174,342 |
| cn. | 07/05/2012 | Front Company 9 | $1,000,000 |
| co. | 07/24/2012 | Front Company 11 | $3,224,668 |
| cp. | 08/01/2012 | Front Company 10 | $1,699,974 |
| cq. | 08/31/2012 | Front Company 10 | $980,011 |
| cr. | 09/05/2012 | Front Company 10 | $649,975 |
| cs. | 09/07/2012 | Front Company 10 | $1,212,965 |
| ct. | 09/12/2012 | DHID | $1,005,136 |
| cu. | 09/14/2012 | DHID | $368,939 |
| cv. | 09/14/2012 | DHID | $642,967 |
| cw. | 09/14/2012 | Front Company 10 | $799,548 |
| cx. | 09/21/2012 | DHID | $729,927 |
| cy. | 10/01/2012 | Bulk Cash Payment | $386,290 |
| cz. | 10/10/2012 | DHID | $1,469,991 |
| da. | 10/10/2012 | Front Company 10 | $1,000,384 |
| db. | 10/26/2012 | Front Company 10 | $3,042,027 |
| dc. | 11/02/2012 | Bulk Cash Payment | $5,239,613 |
| dd. | 11/14/2012 | Front Company 10 | $2,472,974 |
| de. | 12/04/2012 | Front Company 10 | $1,599,966 |
| df. | 12/05/2012 | Front Company 10 | $399,966 |
| dg. | 11/01/2012 | Bulk Cash Payment | $314,096 |
| dh. | 01/15/2013 | Front Company 10 | $2,782,124 |
| di. | 02/08/2013 | DHID | $1,999,967 |
| dj. | 03/12/2013 | DHID | $3,291,014 |
| dk. | 03/29/2013 | Front Company 10 | $855,923 |

| | | | |
|---|---|---|---|
| dl. | 04/17/2013 | DHID | $1,399,927 |
| dm. | 04/22/2013 | DHID | $2,059,944 |
| dn. | 04/29/2013 | DHID | $2,409,300 |
| do. | 05/10/2013 | Front Company 10 | $649,974 |
| dp. | 05/15/2013 | Front Company 10 | $1,122,975 |
| dq. | 05/16/2013 | Front Company 10 | $699,970 |
| dr. | 05/23/2013 | Front Company 10 | $699,970 |
| ds. | 05/30/2013 | Front Company 10 | $1,299,967 |
| dt. | 06/04/2013 | Bulk Cash Payment | $995,000 |
| du. | 07/01/2013 | Front Company 12 | $579,969 |
| dv. | 07/01/2013 | DHID | $919,944 |
| dw. | 07/08/2013 | DHID | $2,019,464 |
| dx. | 07/09/2013 | Front Company 12 | $291,774 |
| dy. | 07/16/2013 | DHID | $269,959 |
| dz. | 07/22/2013 | Front Company 12 | $525,784 |
| ea. | 07/29/2013 | DHID | $999,977 |
| eb. | 07/30/2013 | Front Company 13 | $2,031,457 |
| ec. | 08/21/2013 | Front Company 13 | $658,893 |
| ed. | 08/21/2013 | Front Company 13 | $1,059,975 |
| ee. | 08/22/2013 | Front Company 13 | $1,839,975 |
| ef. | 09/09/2013 | DHID | $1,199,976 |
| eg. | 09/18/2013 | DHID | $1,309,976 |
| eh. | 09/18/2013 | DHID | $1,643,759 |
| ei. | 09/23/2013 | Front Company 12 | $689,976 |
| ej. | 09/25/2013 | DHID | $2,299,976 |
| ek. | 10/21/2013 | DHID | $1,269,966 |
| el. | 10/24/2013 | DHID | $999,974 |
| em. | 10/30/2013 | DHID | $999,962 |
| en. | 11/06/2013 | DHID | $999,974 |
| eo. | 11/07/2013 | DHID | $1,000,383 |
| ep. | 11/13/2013 | DHID | $999,966 |
| eq. | 11/26/2013 | Bulk Cash Payment | $1,990,000 |
| er. | 12/06/2013 | Front Company 13 | $1,299,962 |
| es. | 12/12/2013 | Front Company 13 | $1,099,974 |
| et. | 12/16/2013 | Front Company 13 | $887,962 |
| eu. | 01/09/2014 | Front Company 14 | $993,975 |
| ev. | 01/27/2014 | DHID | $1,307,689 |
| ew. | 02/18/2014 | DHID | $1,492,277 |
| ex. | 02/18/2014 | DHID | $1,999,992 |
| ey. | 03/11/2014 | DHID | $1,499,963 |
| ez. | 03/10/2014 | DHID | $1,684,020 |
| fa. | 03/19/2014 | Bulk Cash Payment | $2,665,966 |

| fb. | 03/19/2014 | Bulk Cash Payment | $3,801,533 |
| fc. | 03/27/2014 | DHID | $993,959 |
| fd. | 04/03/2014 | Front Company 14 | $539,959 |
| fe. | 04/15/2014 | Front Company 13 | $993,974 |
| ff. | 04/16/2014 | Front Company 13 | $1,669,261 |
| fg. | 04/30/2014 | Front Company 14 | $1,075,974 |
| fh. | 05/08/2014 | Front Company 13 | $291,606 |
| fi. | 05/12/2014 | DHID | $999,970 |
| fj. | 05/21/2014 | Bulk Cash Payment | $150,000 |
| fk. | 06/04/2014 | DHID | $1,899,972 |
| fl. | 06/11/2014 | DHID | $1,999,964 |
| fm. | 06/12/2014 | Front Company 15 | $888,814 |
| fn. | 07/08/2014 | Front Company 16 | $67,864 |
| fo. | 07/14/2014 | DHID | $999,972 |
| fp. | 07/16/2014 | DHID | $1,322,972 |
| fq. | 07/16/2014 | Front Company 15 | $2,359,949 |
| fr. | 07/28/2014 | DHID | $999,972 |
| fs. | 07/30/2014 | DHID | $609,972 |
| ft. | 08/05/2014 | DHID | $800,112 |
| fu. | 08/05/2014 | DHID | $199,859 |
| fv. | 08/20/2014 | DHID | $1,075,972 |
| fw. | 09/02/2014 | DHID | $899,972 |
| fx. | 09/11/2014 | DHID | $999,973 |
| fy. | 09/17/2014 | DHID | $920,096 |
| fz. | 09/17/2014 | DHID | $79,876 |
| ga. | 09/24/2014 | DHID | $67,865 |
| gb. | 09/30/2014 | DHID | $999,973 |
| gc. | 10/10/2014 | DHID | $1,005,973 |
| gd. | 10/20/2014 | DHID | $1,199,975 |
| ge. | 10/21/2014 | DHID | $969,973 |
| gf. | 11/04/2014 | DHID | $999,975 |
| gg. | 11/05/2014 | DHID | $1,499,973 |
| gh. | 11/07/2014 | DHID | $999,975 |
| gi. | 11/12/2014 | DHID | $999,975 |
| gj. | 12/01/2014 | Front Company 17 | $67,865 |
| gk. | 12/03/2014 | DHID | $1,469,975 |
| gl. | 12/17/2014 | Bulk Cash Payment | $1,990,000 |
| gm. | 12/18/2014 | Bulk Cash Payment | $1,990,000 |
| gn. | 12/19/2014 | Bulk Cash Payment | $2,487,500 |
| go. | 12/26/2014 | Front Company 18 | $65,675 |
| gp. | 01/23/2015 | Front Company 19 | $9,700 |
| gq. | 01/26/2015 | Front Company 20 | $65,672 |

| | | | |
|---|---|---|---|
| gr. | 02/02/2015 | Front Company 17 | $54,960 |
| gs. | 02/04/2015 | Front Company 21 | $29,915 |
| gt. | 02/04/2015 | Front Company 20 | $39,972 |
| gu. | 02/11/2015 | DHID | $249,960 |
| gv. | 02/11/2015 | Front Company 22 | $270,953 |
| gw. | 02/12/2015 | DHID | $299,954 |
| gx. | 02/12/2015 | Front Company 22 | $199,954 |
| gy. | 02/25/2015 | DHID | $399,954 |
| gz. | 03/02/2015 | Bulk Cash Payment | $1,990,000 |
| ha. | 03/03/2015 | Bulk Cash Payment | $1,990,000 |
| hb. | 03/04/2015 | Bulk Cash Payment | $1,990,000 |
| hc. | 03/12/2015 | DHID | $993,959 |
| hd. | 03/16/2015 | DHID | $319,954 |
| he. | 03/16/2015 | DHID | $469,972 |
| hf. | 03/16/2015 | DHID | $269,954 |
| hg. | 03/16/2015 | Front Company 22 | $1,003,613 |
| hh. | 03/16/2015 | Front Company 19 | $139,190 |
| hi. | 03/17/2015 | Front Company 22 | $139,959 |
| hj. | 03/26/2015 | DHID | $279,225 |
| hk. | 03/31/2015 | DHID | $599,972 |
| hl. | 04/01/2015 | DHID | $183,172 |
| hm. | 04/01/2015 | DHID | $399,954 |
| hn. | 04/21/2015 | Front Company 19 | $139,190 |
| ho. | 04/22/2015 | DHID | $275,960 |
| hp. | 04/30/2015 | Front Company 19 | $125,720 |
| hq. | 05/05/2015 | DHID | $1,599,959 |
| hr. | 05/06/2015 | DHID | $178,055 |
| hs. | 05/14/2015 | DHID | $999,960.40 |
| ht. | 05/19/2015 | Front Company 19 | $125,720 |
| hu. | 06/08/2015 | DHID | $999,960 |
| hv. | 06/09/2015 | Front Company 19 | $155,000 |
| hw. | 06/15/2015 | DHID | $486,008 |
| hx. | 06/18/2015 | Bulk Cash Payment | $995,000 |
| hy. | 06/19/2015 | Bulk Cash Payment | $995,000 |
| hz. | 06/19/2015 | Front Company 19 | $147,250 |
| ia. | 06/22/2015 | Bulk Cash Payment | $995,000 |
| ib. | 06/23/2015 | Bulk Cash Payment | $995,000 |
| ic. | 06/30/2015 | Front Company 22 | $43,434 |
| id. | 07/01/2015 | DHID | $1,299,972 |
| ie. | 07/03/2015 | DHID | $1,699,972 |
| if. | 07/09/2015 | DHID | $462,959 |
| ig. | 07/17/2015 | Front Company 22 | $599,959 |

| | | | |
|---|---|---|---|
| ih. | 07/20/2015 | DHID | $399,972 |
| ii. | 07/23/2015 | DHID | $1,675,972 |
| ij. | 07/29/2015 | Front Company 19 | $134,700 |
| ik. | 08/03/2015 | Front Company 23 | $999,959 |
| il. | 08/04/2015 | DHID | $999,972 |
| im. | 08/04/2015 | DHID | $795,172 |
| in. | 08/13/2015 | DHID | $999,960 |
| io. | 08/27/2015 | DHID | $999,960 |
| ip. | 08/28/2015 | DHID | $969,972 |
| iq. | 09/02/2015 | DHID | $1,009,972 |
| ir. | 09/03/2015 | DHID | $999,972 |
| is. | 09/09/2015 | DHID | $999,972 |
| it. | 09/22/2015 | DHID | $999,959 |
| iu. | 09/25/2015 | DHID | $999,972 |
| iv. | 09/29/2015 | DHID | $999,972 |
| iw. | 09/29/2015 | DHID | $999,959 |
| ix. | 09/30/2015 | DHID | $999,972 |
| iy. | 09/30/2015 | DHID | $466,972 |
| iz. | 10/09/2015 | DHID | $999,972 |
| ja. | 10/13/2015 | DHID | $999,972 |
| jb. | 10/13/2015 | Front Company 23 | $1,975,959 |
| jc. | 10/14/2015 | DHID | $999,972 |
| jd. | 11/09/2015 | DHID | $849,624 |
| je. | 01/29/2016 | DHID | $993,954 |
| jf. | 01/30/2016 | Bulk Cash Payment | $4,577,000 |
| jg. | 02/01/2016 | Bulk Cash Payment | $1,393,000 |
| jh. | 02/24/2016 | DHID | $369,099 |
| ji. | 02/29/2016 | DHID | $993,972 |
| jj. | 03/01/2016 | Front Company 25 | $62,061 |
| jk. | 03/04/2016 | Front Company 25 | $154,719 |
| jl. | 03/08/2016 | Front Company 26 | $332,959 |
| jm. | 03/08/2016 | DHID | $660,972 |
| jn. | 03/09/2016 | Front Company 26 | $993,959 |
| jo. | 03/21/2016 | Front Company 27 | $153,629 |
| jp. | 04/21/2016 | Front Company 25 | $152,758 |
| jq. | 04/29/2016 | Bulk Cash Payment | $6,467,500 |
| jr. | 05/18/2016 | Front Company 25 | $114,669 |
| js. | 05/23/2016 | Front Company 28 | $1,624,109 |
| jt. | 06/03/2016 | Front Company 29 | $199,972 |
| ju. | 06/06/2016 | Front Company 30 | $52,597 |
| jv. | 06/14/2016 | Front Company 7 | $299,957 |
| jw. | 06/14/2016 | Front Company 31 | $154,942 |

| | | | |
|---|---|---|---|
| jx. | 06/21/2016 | Front Company 30 | $299,977 |
| jy. | 06/22/2016 | Bulk Cash Payment | $1,990,000 |
| jz. | 06/23/2016 | Bulk Cash Payment | $1,492,500 |
| ka. | 06/24/2016 | Bulk Cash Payment | $1,492,500 |
| kb. | 06/27/2016 | Bulk Cash Payment | $1,492,500 |
| kc. | 06/27/2016 | Front Company 25 | $157,916 |
| kd. | 07/12/2016 | Front Company 32 | $214,391 |
| ke. | 07/13/2016 | Front Company 32 | $285,593 |
| kf. | 07/14/2016 | Front Company 32 | $278,559 |
| kg. | 07/18/2016 | Front Company 33 | $441,289 |
| kh. | 07/27/2016 | Front Company 33 | $210,144 |
| ki. | 07/26/2016 | Front Company 33 | $280,144 |
| kj. | 07/27/2016 | Front Company 33 | $289,856 |
| kk. | 07/29/2016 | Front Company 33 | $523,683 |
| kl. | 07/29/2016 | Front Company 34 | $143,203 |
| km. | 07/29/2016 | Front Company 32 | $265,424 |
| kn. | 07/29/2016 | Front Company 32 | $267,666 |
| ko. | 08/04/2016 | Front Company 33 | $834,567 |
| kp. | 09/20/2016 | Front Company 7 | $365,410 |
| kq. | 09/29/2016 | Front Company 7 | $399,977 |
| kr. | 10/11/2016 | Front Company 7 | $499,972 |
| ks. | 12/12/2016 | Bulk Cash Payment | $995,000 |
| kt. | 12/13/2016 | Bulk Cash Payment | $995,000 |
| ku. | 12/14/2016 | Bulk Cash Payment | $995,000 |
| kv. | 06/15/2017 | Bulk Cash Payment | $995,000 |
| kw. | 06/15/2017 | Bulk Cash Payment | $1,990,000 |
| kx. | 07/26/2017 | Bulk Cash Payment | $1,094,500 |
| ky. | 11/15/2017 | Bulk Cash Payment | $1,890,500 |

**Transactions Between DPRK Tobacco Company 1 and Company B**

41.     In or around November 2011, a representative of DPRK Tobacco Company 1 approached Company B at a cigarette product exposition in Prague, Czech Republic.

42.     In or around 2013, DPRK Tobacco Company 1 and Company B finalized a deal for Company B to provide tobacco-related materials to DPRK Tobacco Company 1.

43.     On or about November 25, 2015, a DPRK Tobacco Company 1 employee sent an email to Company B from DPRK Tobacco Company 1's DPRK general office email address. The email stated, "We recently set up new branch office in Thailand on behalf of [DPRK Tobacco

Company 1]. We would like to inform you that from now on you'll work with our branch office on transaction between both. Their address is following. Chief of branch: [MYONG] . . . ." The Thai DPRK branch office ("DPRK Branch Office 1"), operated by MYONG, became Company B's contact for sales to DPRK Tobacco Company 1. DPRK Tobacco Company 1 continued to be listed on the sales contracts between Company B and DPRK Tobacco Company 1 until in or around 2018, when DPRK Branch Office 1 started to be listed on these contracts.

44.     In or around the fall of 2017, Company B sold and shipped cigarette production materials to DPRK Tobacco Company 1. Two of the 2017 bills of lading, dated September 14, 2017, and October 19, 2017, listed Dalian Sun Moon, a DPRK front company that was listed as a company doing business in China, as a notifying party. The freight forwarder for these transactions was listed as Samdura Pacific Maju, which was an affiliate company of SINSMS PTE LTD. (SINSMS PTE LTD and Dalian Sun Moon Star International Logistics Co LTD were both sanctioned by OFAC on August 15, 2018.)

45.     On or about the following dates, DPRK Tobacco Company 1 sent wires, each of which was associated with a wire transaction through a U.S. financial institution, from a network of front companies employed by DPRK Tobacco Company 1 to pay Company B for tobacco products purchased, including as follows:[3]

| Sub-¶ | Date | Originator | Amount |
|---|---|---|---|
| a. | 06/06/2014 | Front Company 22 | $7,050 |
| b. | 06/20/2014 | Front Company 22 | $16,520 |
| c. | 03/17/2015 | DHID | $7,012 |
| d. | 04/08/2015 | DHID | $16,581 |
| e. | 07/16/2015 | DHID | $7,010 |
| f. | 08/26/2015 | DHID | $16,575 |
| g. | 12/07/2015 | DHID | $7,011 |

---

[3]     The last payment in the table was held by a U.S. financial institution and was not received by Company 2.

| | | | |
|---|---|---|---|
| h. | 12/23/2015 | DHID | $16,525 |
| i. | 03/02/2016 | DHID | $7,061 |
| j. | 03/09/2016 | DHID | $16,525 |
| k. | 05/10/2016 | Front Company 26 | $7,059 |
| l. | 05/18/2016 | Front Company 26 | $16,575 |
| m. | 07/22/2016 | DHID | $7,060 |
| n. | 10/20/2016 | Front Company 35 | $16,660 |
| o. | 02/24/2017 | Front Company 36 | $47,219 |
| p. | 08/03/2017 | Front Company 37 | $53,000 |
| q. | 08/14/2017 | Front Company 38 | $16,972 |
| r. | 04/12/2018 | Front Company 39 | $27,904 |
| s. | 05/08/2018 | Front Company 40 | $65,310 |

### *Transactions Between DPRK Tobacco Company 1 and Company C*

46.     In or around March 2019, representatives of Company C, to include its CEO, traveled to Pyongyang, DPRK. While there, Company C representatives met with the Board of Directors of DPRK Tobacco Company 1 to negotiate an agreement to sell tobacco to DPRK Tobacco Company 1. MYONG, the President of DPRK Tobacco Company 1 at that time, KIM CHOL-MIN, and other employees were present at these meetings. During the negotiations, DPRK Tobacco Company 1 told Company C representatives that DPRK Tobacco Company 1 would pay for the tobacco in bulk U.S. dollar cash payments, which would be transported by a courier from the DPRK. Under the negotiated agreement, Company C insisted that U.S. dollar cash would be delivered to an affiliated company acting as its agent in Dubai.

47.     On or about May 31, 2019, Company C signed a $2.8 million tobacco contract with DPRK Tobacco Company 1. Under this contract, Company C shipped tobacco destined for North Korea in or around July 2019.

48.     On or about the following dates, DPRK Tobacco Company 1 made the following payments to Company C for this shipment:

a.     On or about October 19, 2019, MYONG and KIM CHOL-MIN delivered approximately $350,000 in cash related to tobacco purchased from Company C

to a courier, who thereafter delivered approximately $337,200 in cash to the Dubai agent for Company C ("Dubai Agent"), who worked at Dubai Company 1.

b. On or about December 20, 2019, a courier traveled to the DPRK to pick up approximately $1,586,948 in cash from DPRK Tobacco Company 1 as partial payment for the sale of tobacco by Company C to DPRK Tobacco Company 1. The cash was accompanied by a "Foreign Currency Declaration" slip issued by the FTB and a cash receipt signed by RI TONG-MIN, as well as two DPRK Tobacco Company 1 employees. Approximately $1,174,812 was then delivered to Company C's Dubai Agent.

49.    On or about the following dates, DPRK Tobacco Company 1 made additional payments to Company C, as follows:

a. On or about November 19, 2020, an employee acting as a representative of DPRK Tobacco Company 1, delivered $2,829,625 in cash for Company C to a middleman who in turn delivered it to Dubai Company 1's Hong Kong office.

b. On or about November 25, 2020, the same employee, as a representative of DPRK Tobacco Company 1, delivered $1,912,285 U.S. dollars in cash for Company C to a middleman who in turn delivered it to Dubai Company 1's Hong Kong office.

### U.S. Dollar Transfers Sent to Company C

50.    On or about the following dates, money sent by DPRK Tobacco Companies 1 to Dubai and Hong Kong for Company C was deposited at Dubai Company 1, operated by the Dubai Agent.

a.   On or about October 22, 2019, Dubai Agent noted the receipt of "335k USD" was received and discussed how to document the cash payments in a way that would be acceptable to Company C's bank, claiming it was a gold purchase.

b.   On or about November 30, 2020, a Company C employee sent a voice message to the Dubai Agent in coded language stating that "napkins" would be available totaling "800,000." Napkins was a word used to refer to money. The Company C employee stated those funds would need to be "TT'd," meaning a wire transfer, which the employee referred to as sending an "electronic pigeon if you know what I mean." The Dubai Agent noted that Dubai Company 1 needed shipping documents in Hong Kong to justify the payment. The Dubai Agent stated, "locally we can make some . . . these documents."

51.   On or about the following dates in December 2020, Dubai Company 1's Hong Kong office sent $3,700,000 in wire transfers to the Dubai Company 1's bank account in Dubai, which were processed by U.S. financial institutions, as follows:

| Sub-¶ | Date | Amount | Originator | Beneficiary |
|-------|------|--------|------------|-------------|
| a. | 12/22/2020 | $1,500,000 | Dubai Co.'s HK Company | Dubai Company |
| b. | 12/28/2020 | $2,000,000 | Dubai Co.'s HK Company | Dubai Company |
| c. | 12/28/2020 | $200,000 | Dubai Co.'s HK Company | Dubai Company |

**Transactions Between DPRK Tobacco Company 1 and Company D**

52.   On or around July 16, 2017, Company D sent an email to MYONG which stated, "Attached [bill of lading] for your reference and will forward endorsed copy once it is available." The bill of lading that was attached showed the goods were being sent by a Vietnamese tobacco company and the notifying party was Dalian Sun Moon. The consignee, or recipient of the goods,

was listed as "Sun Moon Star Trading Corporation," with its corresponding address in North Korea.

53.     In or around August 2017, Company D and DPRK Tobacco Company 1 started to negotiate a new contract for ongoing orders. Specifically, on or about August 11, 2017, MYONG sent an email to Company D stating "Good afternoon. As discussed int the meeting, we will order with you the kitset for 24000 cases of catfish." MYONG's statement about "catfish" was a reference to cigarette components being purchased by DPRK Tobacco Company 1.

54.     On or about August 16, 2017, Company D sent MYONG an "interim tax invoice." Company D stated that it would "furnish a proper invoice" once a front company was established. The invoice was missing header information that would typically list the issuer of the invoice. The attachment invoice stated that it was "[f]or 24,000 Cases."

55.     On or about August 16, 2017, Company D sent MYONG an email that stated, "As per your request, please find attached revised tax invoice with the omission of filter rod." The attached invoice was missing Company D's name which was usually prominently displayed at the top of each invoice. No company name was listed as the issuing party of the invoice on this version.

56.     In response, on or about August 16, 2017, MYONG responded to Company D and stated, "Thanks for the revised invoice. Pls see the attached 2 payment slip. That was the last one, no more coming. As said on the phone, pls send me the visa application letter together with the passport details of the travelers to my factory in Sept asap so that we can process for visa issuance in time. Thanks."

57.     On or about August 17, 2017, Company D sent a letter to MYONG about a September 2017 Company D visit to DPRK Tobacco Company 1's office in Pyongyang. The

purpose of the visit was "to facilitate exchange of business information and explore ways to further expand business cooperation."

58.     On or about August 20, 2017, MYONG sent an email to Company D informing it that DPRK Tobacco Company 1 could no longer afford a large order of tobacco that they previously negotiated. MYONG detailed the changes to the order to make it less expensive and discussed Company D needing to pick up U.S. dollar bulk cash at DPRK Tobacco Company 1's headquarters for the shipments. At the end of the message MYONG stated, "This is the best and only option to take to continue the catfish business." MYONG's statement about "catfish" was another reference to DPRK Tobacco Company 1's purchase of cigarette components.

59.     On or about August 28, 2017, after continued revisions to the invoice that were discussed, Company D sent an email to MYONG with the latest version of the invoice. This version was also missing Company D's name, which had been replaced by the name of a company located in Southeast Asia (SE ASIA Front 1).

60.     On or about September 3, 2017, KIM CHOL-MIN sent Company D an email that discussed changes to the invoice then circulating and stated, "So pls send me revised invoice again with the contract. They need also contract for new order." KIM CHOL-MIN also requested an agreement authorizing SE Asia Front 1 "to do this transaction on behalf of" Company D.

61.     On or about September 4, 2017, Company D sent an email directed to KIM CHOL-MIN with a contract attached between DPRK Tobacco Company 1 and SE Asia Front 1. This was a contract for 192,816 kilograms of cut rag tobacco along with other tobacco and cigarette-related goods. The contract totaled $1,826,358.28.

62.     On or about September 11, 2017, MYONG sent a signed version of the aforementioned contract to Company D.

63.     Between on or about September 19, 2017, and on or about October 24, 2017, Company D employees traveled to DPRK to collect bulk cash payments in U.S. dollars. The Company D employees received a form in the DPRK that allowed its employees to travel through China without issue, which listed FTB as the bank involved in the transactions and was signed by the President of KKBC.

64.     On or around February 4, 2018, Company D sent an email to MYONG which stated, "I noted your order for year 2018 and will continue to work with you in the near future."

65.     On or about the following dates, DPRK Tobacco Company 1 sent wires from a network of front companies employed by DPRK Tobacco Company 1, all of which were associated with a wire transaction through a U.S. financial institution, all to pay Company D for tobacco products purchased, including as follows:

| Sub-¶ | Date | Originator | Amount |
|-------|------|-----------|--------|
| a. | 12/02/2009 | DHID | $67,333 |
| b. | 07/12/2013 | Front Company 10 | $62,498 |
| c. | 01/29/2014 | DHID | $305,916 |
| d. | 03/19/2014 | Front Company 13 | $1,330 |
| e. | 05/19/2014 | DHID | $47,727 |
| f. | 08/06/2014 | DHID | $38,566 |
| g. | 11/05/2014 | DHID | $2,038 |
| h. | 09/03/2015 | Front Company 41 | $57,537 |
| i. | 09/11/2015 | DHID | $97,073 |
| j. | 09/29/2015 | Front Company 41 | $33,647 |
| k. | 12/10/2015 | DHID | $44,468 |
| l. | 10/27/2016 | Front Company 42 | $97,021 |
| m. | 11/14/2016 | Front Company 43 | $115,358 |
| n. | 03/01/2017 | Front Company 44 | $331,459 |
| o. | 05/26/2017 | Front Company 37 | $199,904 |
| p. | 05/31/2017 | Front Company 45 | $129,540 |
| q. | 06/07/2017 | Front Company 46 | $44,950 |
| r. | 06/12/2017 | Front Company 47 | $6,685 |
| s. | 06/16/2017 | Front Company 48 | $250,000 |
| t. | 06/21/2017 | Front Company 49 | $25,993 |
| u. | 06/26/2017 | Front Company 48 | $74,393 |

| v. | 07/18/2017 | Front Company 50 | $27,975 |
| w. | 07/20/2017 | Front Company 50          , | $34,975 |
| x. | 07/24/2017 | Front Company 51 | $62,970 |
| y. | 08/01/2017 | Front Company 52 | $84,237 |
| z. | 08/09/2017 | Front Company 53 | $300,000 |
| aa. | 08/14/2017 | Front Company 50 | $50,000 |
| ab. | 08/15/2017 | Front Company 50 | $53,999 |

66.    On or about the following dates, DPRK Tobacco Company 1 sent bulk cash payments to pay Company D for tobacco products purchased, and included therewith receipts noting the payment was facilitated by FTB, as follows:

| Sub-¶ | Date | Originator | Amount |
|---|---|---|---|
| a. | 09/19/2017 | Bulk Cash Payment | $518,000 |
| b. | 10/24/2017 | Bulk Cash Payment | $1,350,464 |

### *Transactions Between DPRK Tobacco Company 1 and Company E*

67.    On or about July 3, 2018, KIM CHOL-MIN emailed a Company E agent stating, "Good morning. I am a manufacturer of cigarette. I need the FCV tobacco leaf for my factory. Currently I need the cigarette paper: 26.5mm x6000m, 27gsm, Verge type, 2 containers x 40ft. Can you supply it? Wait for the positive reply. Thanks." Company E responded that they could supply the goods requested and started an email exchange about supplying the goods and payment details.

68.    On or about July 23, 2018, DPRK Tobacco Company 1's employees engaged in back-and-forth emails with Company E employees related to a Pro Forma Invoice, and ultimately finalized a contract with Company E. The transaction records show that the customer, consignee, and notifying party are all listed as the same entity in Dalian, China.

69.    On or about July 30, 2018, KIM CHOL-MIN confirmed that a payment had been made for $50,120 to Company E.

70.     On or about July 31, 2018, Company E confirmed that they received the U.S. dollar wire transfer that was processed through a corresponding U.S. financial institution.

71.     On or about December 18, 2018, KIM CHOL-MIN emailed Company E about a shipment that had been received in Dalian, China (which the paperwork related to the shipment suggested was the final destination). MYONG stated to Company E, "Thanks for your update. Yes. My agent already took it over and will ship out [t]his Thursday from Dalian. Thanks."

72.     In or around June 2019, MYONG ordered additional products from Company E for DPRK Tobacco Company 1. The paperwork listed Front Company 35 as the consignee and SE Asia Front 2 was listed as the customer. Front Company 35 had been used in different deals initiated by DPRK Tobacco Company 1, to include a payment to Company B.

73.     On or about the following dates, DPRK Tobacco Company 1 sent wires from a small network of front companies employed by DPRK Tobacco Company 1, some of which were associated with a wire transaction through a U.S. financial institution, all to pay Company E for tobacco products purchased, including as follows:

| Sub-¶ | Transaction/Invoice Date | Originator | Amount |
|---|---|---|---|
| a. | 07/31/2018 | SE Asia Front 2 | $50,120 |
| b. | 09/07/2018 | SE Asia Front 2 | $52,225 |
| c. | 04/09/2019 | Front Company 54 | $68,240.75 |
| d. | 06/13/2019 | Front Company 55 | $130,086 |

### DPRK Tobacco Company 1's Shipments Through Dalian, China

74.     On or about the following dates, DPRK Tobacco Company 1 employees communicated with each other and with RI TONG-MIN regarding shipping of goods for DPRK Tobacco Company 1 through Dalian, China to North Korea:

    a.      On or about September 8, 2016, MYONG addressed an email to RI WON-HO discussing invoices for cigarette filters and spare parts being shipped to Dalian,

China. One attached invoice was addressed to RI WON-HO at DPRK Tobacco Company 1's address in Pyongyang, DPRK, with delivery to RI TONG-MIN in China. The invoice was for cigarette supplies which was agreed to be paid in U.S. dollars.

b.    On or about September 12, 2016, KIM CHOL-MIN emailed a business partner advising that DPRK Tobacco Company 1's Dalian agent's email was the same email used by RI TONG-MIN.

c.    On or about November 2, 2016, KIM CHOL-MIN emailed RI TONG-MIN, stating that DPRK Tobacco Company 1 was going to buy tobacco from a new supplier in India, and asked RI TONG-MIN to review the draft contract and arrange the transit. The draft contract specified payment in U.S. dollars, and listed RI WON-HO as the official at DPRK Tobacco Company 1 who would sign the contract.

d.    On or about February 2, 2017, MYONG forwarded an email from RI TONG-MIN to a Pakistani tobacco material company ("Pakistan Tobacco Material Supplier 1"), wherein RI TONG-MIN advised the procedure for the shipments to North Korea was for the bills of lading to be switched from Dalian, China to DPRK for onward travel to Korea. Pakistan Tobacco Material Supplier 1 responded that they would courier the bills of lading to RI TONG-MIN.

e.    On or about February 8, 2017, RI TONG-MIN sent an email to Company D with a copy to MYONG, discussing a price quote and shipping instructions for a shipment from Vietnam to North Korea related to a DPRK Tobacco Company 1 order. RI TONG-MIN instructed that the "Master" bill of lading will be DPRK

Tobacco Company 1 "together with their Korean address" and further stated the notifying party will be RI TONG-MIN's Dalian, China office.

f.  On or about February 18, 2017, a Brazilian tobacco supplier employee sent an email to RI TONG-MIN related to freight transportation to Nampo, North Korea of a tobacco leaf shipment for DPRK Tobacco Company 1. RI TONG-MIN responded he could arrange the transport of the goods and advised that the goods would be routed through Dalian, China, before being sent to Nampo, North Korea.

g.  In or around August and September 2017, MYONG, KIM CHOL-MIN, and RI TONG-MIN further exchanged emails with the Brazilian tobacco supplier employees about tobacco shipments from Brazil to Dalian, China, for DPRK Tobacco Company 1.

75.    On or around December 31, 2017, RI WON-HO forwarded MYONG a message from KIM YONG-BOK discussing the difficulty the new year may bring and best wishes for the new year. In the same message, RI WON-HO told MYONG that DPRK Tobacco Company 1 had worked with the shipping company to speed up the delivery's arrival time at Nampo Port, North Korea.

## B.  DPRK Tobacco Company 2

### Transactions Between DPRK Tobacco Company 2 and Company C

76.    In or around April 2021, MYONG, then working at DPRK Tobacco Company 2, engaged KIM SE UN as an intermediary to procure from Company C the same grades of tobacco previously supplied by Company C to DPRK Tobacco Company 1.

77.    On or around June 5, 2021, DPRK Tobacco Company 2 sent documentation stating

that KIM SE UN was authorized by DPRK Tobacco Company 2 to conduct procurement for the company. The letter was signed by MYONG.

78.     On or about December 24, 2021, DPRK Tobacco Company 2 and Company C entered into a tobacco supply contract. MYONG's name was listed as a witness to the contract. This signed contract differed from prior draft versions, in that the finalized version listed a Chinese front company instead of DPRK Tobacco Company 2. Additionally, all other references to the DPRK were removed from this new contract.

79.     On or about March 23, 2022, KIM SE UN reviewed shipping documents related to the first shipment of tobacco under the new contract, and approved the same, including a bill of lading identifying Company C as the shipper and the place of delivery as Dalian, China.

80.     On or about July 12, 2022, MYONG made a payment to a company in Dalian for smuggling services and ordered that the excess funds be sent to SIM.

81.     On or about July 14, 2022, MYONG and KIM SE UN caused SIM to pay to $863,100 to the Dubai Agent, comprised of 8,631 $100 U.S. dollar bills.

82.     On or about July 14, 2022, MYONG, KIM SE UN, and SIM communicated that the payment was completed.

83.     On or about August 2, 2022, MYONG and KIM SE UN caused SIM to make a payment of $45,583 to be made through a foreign bank account in the name of a U.S. person to Individual 1, a broker for the transaction between DPRK Tobacco Company 2 and Company C.

84.     In or around December 2022, an additional shipment of tobacco under the contract occurred.

85.     On or about April 2, 2023, KIM SE UN communicated that MYONG was having difficulty making payments to Company C because of the fees to transfer currency from China to Dubai.

86.     On or about April 10, 2023, MYONG and KIM SE UN caused SIM to pay approximately $800,000 in cash in Dubai, which was transferred to the Dubai Agent, as payment for the December 2022 shipment.

### *U.S. Dollar Transfers Sent to Company C*

87.     Thereafter, on or about at least the following dates, the Dubai Agent, through Dubai Company 1, commingled the cash payment for Company C received from DPRK Company 2 with other funds for Company C, as part of a bulk wire transfer that was processed by a U.S. financial institution:

| Sub-¶ | Date | Originator | Beneficiary | Amount | Wire Notes |
|---|---|---|---|---|---|
| a. | 4/12/2023 | DUBAI COMPANY 1 | Company C's Affiliated Entity | $1,004,473.88 | SIM P02 |

**(Conspiracy to Violate the International Emergency Economic Powers Act, in violation of Title 50, United States Code, Section 1705)**

## COUNT TWO
(Conspiracy to Commit Bank Fraud)

88.     The allegations in Paragraphs 1 through 87 of this Indictment are incorporated and re-alleged by reference herein.

89.     Between at least in or around April 2007 and continuing until in or around September 2023, defendants MYONG CHOL-MIN, KIM YONG-BOK, KIM CHOL-MIN, also RI TONG-MIN, RI WON-HO, KIM SE UN, SIM HYON-SOP, and others known and unknown to the Grand Jury, within the District of Columbia and elsewhere, knowingly combined, conspired, and agreed together and with each other to execute and attempt to execute a scheme and artifice to

obtain money, funds, credits, assets, securities, and other property owned by and under the custody

and control of a financial institution as defined in 18 U.S.C. § 20, by means of false and fraudulent

pretenses, representations, and promises, *to wit*, by presenting false information about the nature

of the transactions to U.S. financial institutions, with the intent to obscure the involvement of North

Korea, KKBC, and FTB therein, and thereby exposing the financial institutions to risk of loss, to

include potential criminal and civil liabilities, all in furtherance of schemes to procure tobacco for

North Korea through DPRK Tobacco Company 1 and DPRK Tobacco Company 2.

(**Conspiracy to Commit Bank Fraud,** in violation of Title 18, United States Code, Sections 1344(1) & (2), 1349)

## COUNT THREE
(Conspiracy to Launder Monetary Instruments)

90.     The allegations in Paragraphs 1 through 87 of this Indictment are incorporated and

re-alleged by reference herein.

91.     Between at least on or around August 2007 and continuing until in or around

September 2023, defendants MYONG CHOL-MIN, KIM YONG-BOK, KIM CHOL-MIN, also

RI TONG-MIN, RI WON-HO, KIM SE UN, SIM HYON-SOP, and others known and unknown

to the Grand Jury, within the venue of the U.S. District Court for the District of Columbia,

knowingly combined, conspired, and agreed together and with each other to transport, transmit,

and transfer monetary instruments and funds from a place in the United States to and through a

place outside the United States and to a place in the United States from and through a place outside

the United States with the intent to promote the carrying on of specified unlawful activity to wit,

conspiracy to commit violations of IEEPA as set forth in Count One and conspiracy to commit

bank fraud as set forth in Count Two.

(**Conspiracy to Launder Monetary Instruments**, in violation of Title 18, United States Code, Sections 1956(a)(2)(A) & (h))

## FORFEITURE ALLEGATION

92.     The allegations contained in Counts One through Three of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

93.     Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), upon conviction of violations of Title 18, United States Code Sections 1344 and 1349, and Title 50, United States Code Sections 1703, defendants shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable to said violation(s). The United States will also seek a forfeiture money judgment for a sum of money equal to the value of any property, real or personal, which constitutes, or is derived from proceeds traceable to this offense. The property to be forfeited includes, but is not limited to, the following:

    a.     All fees, payments, and monies derived from services performed on behalf of the conspiracy.

94.     The allegations contained in Counts One through Three of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 982(a)(1).

95.     Pursuant to Title 18, United States Code, Section 982(a)(1), upon conviction of an offense in violation of Title 18, United States Code Section 1956, defendants shall forfeit to the United States of America any property, real or personal, involved in such offense, and any property traceable to such property. The United States will also seek a forfeiture money judgment for a sum of money equal to the value of any property, real or personal, which constitutes, or is derived from

proceeds traceable to this offense. The property to be forfeited includes, but is not limited to, the following:

a. All fees, payments, and monies derived from services performed on behalf of the conspiracy.

96. If any of the property described above, as a result of any act or omission of a defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

A TRUE BILL

FOREPERSON

Attorney of the United States
in and for the District of Columbia